### TOM. BALLINGER *v.* THE STATE.

1. EVIDENCE — IMPEACHMENT OF WITNESSES — CASE STATED. — The principal witnesses for the State being beyond the jurisdiction of the court, the county attorney made affidavit to that fact and introduced their written testimony taken before an examining court. In order to impeach this testimony by showing contradictory statements of the witnesses, the defense sought to introduce their written declarations made before an examining court in the examination of two co-defendants, charged separately with the same offense. *Held,* that the proposed evidence was properly excluded. For an elaboration of the principle, see the opinion *in extenso.*

2. AFFIDAVIT — PRACTICE. — As a predicate for the introduction of the written testimony of one L., the county attorney filed an affidavit

in which it was averred that this witness was beyond the jurisdiction of the court. After the trial and in the motion for new trial, the defense assailed this affidavit by counter-affidavit. *Held*, that at such stage of the case the proceeding is too late. And *held further*, that it was defective in failing to show that the facts were not accessible, or by proper diligence might not have been accessible, when the affidavit for the State was filed.

### On Rehearing.

3. Same.— An affidavit under article 772, Code Criminal Procedure, which avers that "the witnesses reside out of the State of Texas, and are residents of the Indian Territory," is sufficient as to non-residence, and non-jurisdiction of the court.

4. Bills of Exceptions must state enough of the evidence or facts proved to render intelligible the ruling excepted to. The signature of the judge to the bill of exceptions certifies only that the objections stated were the ones urged, not that they were true in fact.

5. Transcript — Depositions.— District Court Rule No. 75 prohibits the incorporation into the transcript of the commission, notices and interrogatories of a deposition, and this rule is applicable to written testimony taken before an examining court.

Appeal from the District Court of Cooke. Tried below before the Hon. C. C. Potter.

The indictment charged the theft, from M. R. Reynolds, of two hundred and ten dollars, on the 30th day of January, 1881. The verdict assessed a term of four and a half years in the penitentiary as the punishment.

About the substance of the testimony of M. R. Reynolds, as shown by the written memoranda taken down and verified on the examining trial, is that, on the night in question, the witness, who was then at "Elm," a suburban resort of Gainesville, hired the defendant to drive him to town. At a point on West California street, between two livery stables, he got out of the carriage, and the defendant called on him for five dollars, the amount of fare he claimed. The witness, who previously had gold money in his pocket, felt for it, and, missing it, told the defendant he did not have it with him. The defendant "cut up" about it, and witness told him that he had

money at the wagon-yard. He went into the wagon-yard, reached into his wagon under some hay and got out a paper roll containing $245. Returning, he commenced unrolling the money, saying to the defendant, "Now I will pay you." When the witness got up near the carriage, still looking in his roll for a five-dollar bill, the defendant snatched the bundle from his hand, and made off with $210. The witness did not know how many persons were in the hack at the time.

The cross-examination was exhaustive but produced no material variance from the examination-in-chief. Witness declared, however, that he did not return to "Elm" after his money was taken. He denied knowledge of having visited an oyster saloon before his money was taken. He denied that he was drunk at the time of the theft, but admitted that he sometimes got drunk, on which occasions he would not know what he did; and that he did get drunk after his money was taken. He could give no satisfactory account of his movements after these occurrences until he was arrested next morning. He was shaved next morning, but whether before or after his arrest he did not know, but did tell the barber he had no money with which to pay. He had $293 when he reached town, and spent $43 before he was robbed. An Indian who came with him to town was with him when he went to Elm before he was robbed.

The substance of the testimony of Charles Byington, as shown by his deposition, was that he came to Gainesville with Reynolds, the last witness, and stopped with him at the wagon-yard. Reynolds had $294 when they reached town. The witness last saw him with money at about 8 o'clock on the same evening. He had then $244 in greenbacks, and some gold and silver.

Cross-examined, this witness stated that he got with Reynolds near Boggy depot, on the M. K. & T. Railroad, in the "Nation," and traveled with him to Forrestburg,

and thence to Gainesville. He saw Reynolds count his money on the road, and saw the money last about 8 o'clock .P. M. on the evening of the robbery, when .Reynolds gave it to him to keep until called for. He kept it a short while, about an hour, and returned it. The witness remained at the wagon-yard barn while he had the money, and had during the time nearly all of it. He returned it in the yard, and Reynolds went off, the witness did not know where. A. L. Leston had charge of the wagon-yard when Reynolds got the money, and had not closed up.

The witness again saw Reynolds in about thirty minutes. He came to the stable, went to the wagon, and then to "Elm." He was drinking then, and was pretty "tight." The witness walked with Reynolds to "Elm" about 4 o'clock that evening. Reynolds left witness there, returned to town, and then came back. Reynolds first told him of the loss of the money at the "Hall" (Elm). Returning to town, Reynolds ran on ahead of the witness to the wagon, saying he was going to look for his money. This was after Reynolds's last visit to the "Hall." The two went to bed in the wagon about 1 o'clock, when Reynolds again looked for his money. The witness was a full-blood Choctaw Indian, about sixteen years old.

A. E. Leston's testimony was in substance that he was employed at the livery stable of E. E. Graves on the night of January 30, 1881, when the witness Reynolds came to the wagon-yard, saw him then, again about dark, and later after the arrest of the defendant, at which time witness put him to bed. He saw the defendant and Scott Hayes, and heard Gussie Reagan's voice in front of the stable about 11 o'clock on that night. When first seen by the witness this last time, Reynolds was standing outside a hack, between the wheels, and defendant had hold of him. The defendant said: "I want five dollars." Reynolds asked: "What for? It is too much." Gussie

Reagan said: "It is one dollar apiece." Reynolds replied: "Hold on a minute!" The party wanted Reynolds to get into the hack. He said: "I want to see if I have got all of my money! I had over two hundred and forty dollars." The witness then heard Reynolds say: "Hold on; you have got mighty near all of my money, now!" They then started off up the street; the witness went in, put on his pants, came out, and saw that they had stopped in front of a neighboring lumber yard. He ran towards them in his sock-feet, and heard a "racket" in the hack just before he reached them. The hack started on, the witness running alongside. The witness hallooed to defendant to "stop." While running, he saw Scott Mayes sitting on the front seat in the hack. The party would not stop. Presently the witness met John Owens in his, Owens's, hack, and knowing him to be a policeman, stopped him. The defendant's hack went on to "Elm," and returned in about fifteen minutes with defendant, Mayes and Reagan. The latter, on witness stepping up to the hack, said: "Howdy, Al." The witness then asked defendant where the old man (Reynolds) was, and he replied that he was down at the "Hall." The witness then told defendant to bring him back, and he said in reply that he would if the old man would come. The witness then, not in so many words, but in language they understood, accused them of committing this offense. Gussie Reagan, in reply, asked: "Are you running the old man?"

The cross-examination of this witness did not change his testimony. He denied that Gussie Reagan told him that the old man was going to stay with her, but, without being asked, she said to witness that he, Reynolds, had gone to bed and was going to stay with Flora Smith, alias "Tid-Bit."

John Owens testified that as soon as he heard of the occurrence, he drove fast in his own hack to "Elm Hotel,"

following another hack. When he arrived he found defendant's and no other hack there, and defendant, Mayes and Reynolds were in the house, close together. When he got there defendant, Mayes and Gussie Reagan got into defendant's hack and drove to town. The witness was a police officer, but his driver being sick, was driving his hack himself that night. While at the hall he heard Reynolds say that the hack drivers had robbed him.

Gussie Reagan was the first witness for the defense. She testified, in substance, that at the time of the alleged offense she was an inmate of the "Elm Hotel." Reynolds, defendant, Scott Mayes, John Bozell, Flora Smith and herself came up town from the "Hotel" that night, to get some oysters. When they reached town, Reynolds said he did not have enough money to pay for the oysters. She asked him how, then, he was going to pay the hack-hire. He replied that he had money at the stable. The hack was then driven there, Reynolds got out, went through or around the stable, and presently returned with a roll of money in his hand, and paid the defendant five dollars for hack fare. The witness defined her position with reference to the defendant and Reynolds, whom she could see plainly, and asserted positively that the defendant did not snatch anything from Reynolds, and that he received from him only the five dollars. The hack then started to the hotel, and when it did so, Reynolds shouted: "Wait! I want to go back." He kept up such a "racket," the witness told the defendant to stop, and take him in, which he did, and the entire party went back to the "Hotel." Reynolds was drunk.

The cross-examination elicited nothing of importance. The witness said that after Reynolds had paid the fare at the stable, she directed the defendant to drive on, as she wanted to get rid of him. He had paid her to "stay" with her that night, but had got so drunk she wanted to be relieved of him.

D. J. Taylor testified, for the defense, that he was a policeman at the time of the alleged robbery. On the morning following, between daylight and sun-up, he found Reynolds lying on the west side of the square, with his feet on the side-walk and his head back between two houses. He was very drunk and had $30 or $40, mostly in greenbacks, in his outside pocket, which the witness took from him.

Jessie Anton testified, for the defense, that on the morning after the alleged robbery Reynolds came into his barber shop, after sun-up, to be shaved. After being shaved, he said he had no money with which to pay. Witness replied that he knew better, and wanted his pay. Thereupon Reynolds turned his back on witness, opened a pair of outside pants, and from the pocket of an inside pair of pants took a roll of money. Witness looked over his shoulder and saw the roll, which was larger than a man's thumb, but did not know whether it was a roll of five or one hundred dollar bills, nor how much it contained.

George Cresswell, for the defense, testified that he was bar-tender at the Elm Hotel on the night of the alleged robbery. While there, Reynolds, who was drunk, handed him a twenty dollar bill to pay for some drinks. The witness paid Gussie Reagan and Flora Smith each five dollars out of it. The old man, Reynolds, went off without getting his change. He did not seem to know or care what went with his money. He did not call for his change until after he heard the witness testify on a former trial, when he called for and got the balance.

The opinion of this court states the matters of fact immediately relevant to the rulings.

## ON REHEARING.

*Potter & Lanius,* for appellant. The leading point we make is the total inadmissibility of the writing offered as

the testimony of Reynolds, Byington and Leston, for this reason among others, that it was not the testimony of those witnesses, and because there was nothing to show that it was genuine.  This point was directly raised in our bill of exceptions number 4, and was assigned as error.

Now the question is, what is there in the record or in fact that even tends to show that the writing offered in evidence is the testimony of those witnesses?  We answer that there is absolutely nothing.  The style of the case in which the evidence was taken is not given.  The number of the cause is not to be found.  No heading or introduction, no file-mark, and stranger still no certificate of the justice as provided by the very article of the Code that permits the introduction of such evidence at all. The style, the number, file-mark and heading are generally and properly written, and the certificate is absolutely indispensable.  We do not deny that, under the repeated decisions of this court, if this was really the testimony taken in this case on examination, the justice and perhaps other parties might be called to testify what the witness said on such trial, and use the writing as a memorandum.

But no witness is called; nobody identifies the writing; nobody pretends to state what was said by the witness, and nobody assumes the responsibility of saying that the writing is the genuine evidence of the witnesses; and still it is admitted for the purpose of relieving a man of his liberty, in total violation of the statute.  Art. 774, Code Crim. Proc.; *Davis* v. *State*, 9 Texas Ct. App. 365.  This identical question was passed on in the above case.  In addition to this the Code, arts. 267 and 314, provides how the testimony shall be taken in the examining court, and how it shall be certified, and this is the kind of certificate that is meant in art. 774, above referred to.  This certificate should state the taking of the testimony, the swearing of

the witnesses, the signing by them, the cause in which taken, etc. Now should this certificate be made by the justice but not in the manner provided by law, or if it be not made at all, the only way the writing could be used would be as a memorandum for some witness who, when placed upon the stand, proposes to state the evidence of the witness on the examination; and even if it was a statement of defendant himself, made in the manner provided by law, it would have to be certified, or be proven orally. *Guy* v. *State*, 9 Texas Ct. App. 162; 1st Greenleaf's Evidence, 227; *State* v. *Simien*, 30 La. An. 296. As before stated, nothing of this kind was done in this case, but the writing itself was used without identification or substantiation.

If illegal evidence be introduced, a new trial must be granted. *McWilliams* v. *State*, 44 Texas, 116; *Preston* v. *State*, 4 Texas Ct. App. 186; *Haynie* v. *State*, 2 Texas Ct. App. 169. In this case the illegal evidence contains all of the inculpatory facts in the case.

*H. Chilton*, Assistant Attorney General, for the State.

WHITE, P. J. Three parties were originally charged with the theft. Upon their arrest they had three separate trials before an examining court; at which trials the testimony of the witnesses was reduced to writing. Subsequently two at least of the parties charged were separately indicted; one of whom was appellant. Upon his trial, two of the most important State's witnesses being absent, the district attorney made affidavit under authority of article 773 of the Code of Criminal Procedure, that the said witnesses had removed beyond the limits of the State and jurisdiction of the court, and asked to introduce, and was permitted by the court to introduce, the testimony of said witnesses taken at the examining trial of appellant Ballinger. (Code Crim. Proc. art. 772.)

Defendant, for the purpose of impeaching this testi-

mony by showing contradictory statements of the witnesses with regard to the same transaction, offered the written testimony of these same witnesses taken at the examining trial of Gussie Reagan, one of the other parties who had originally been implicated in the crime. The prosecution objected to this impeaching evidence, upon the ground that no predicate had been laid, nor opportunity offered the witnesses for explanation; which objection was sustained and forms the basis of the principal error complained of.

The general rule, and it is the one which has uniformly prevailed in Texas, is stated very concisely and explicitly by Mr. Wharton in his work on Evidence. He says, "When it is thus intended to discredit a witness by showing that he has on former occasions made statements inconsistent with those made on trial, it is usually requisite to ask him on cross-examination whether he has not made such prior contradictory statements. The question to this effect should specify, so it is said, the person to whom the alleged contradictory statements were made, and as far as possible the time and place. Only upon denial, direct or qualified, by the witness that such statements were made can proof of them be offered. The object of this condition is to enable the witness to recall the incidents and to explain the inconsistency, if there be such. So a witness, not a party, cannot be impeached by putting in evidence his letters unless his attention be called to these letters on his cross-examination, and the other party have an opportunity of examining him thereto. It has been even held that where the deposition of a deceased witness had been by consent read in evidence, another and conflicting deposition of the same witness at a prior trial could not be read in order to impeach the witness, as the attention of the witness had not been called to the conflict." 1 Whart. on Ev. (2d ed.) § 555.

If his prior depositions in the same case cannot be thus used, *a fortiori* his depositions in another and different case ought not and should not be used. Our statute allowing the testimony of a witness taken at an examining trial to be used subsequently on the final trial, where the witness is beyond the jurisdiction of the court, is an innovation upon the ancient common law, and, in view of the constitutional guarantee that an accused shall have the right to be confronted with the witnesses against him, is permitted solely *ex necessitate* and under circumstances where it appears he did confront the witness and have the right thoroughly to examine and cross-examine him, whether he exercised the right or not upon all the matters testified to by him. We do not think it would be the part of wisdom or sound policy to extend the rule further, and allow such testimony thus taken to be nullified and destroyed entirely by parties who from their own laches or indifference have failed to have it as full and satisfactory as it might have been, had proper diligence been promptly used in the assertion and protection of their rights at the proper time. We are of opinion the court did not err in refusing to allow the introduction of the supposed contradictory evidence.

With regard to the witness Leston it was attempted, after the trial and in the motion for new trial, by the force of counter-affidavits to annul and destroy the affidavit of the district attorney, to the effect that this witness was also beyond the jurisdiction of the court, said affidavit having been made as a predicate for the introduction of his testimony taken at the examining trial. These counter-affidavits came too late to avail defendant, and they fail to show that the facts stated were not accessible, or might not have been accessible by the use of proper diligence at the time when the affidavit of the district attorney was filed and acted upon. Steps should then and there have been taken by defendant to contro-

vert the affidavit. He cannot be allowed, after he has failed to complain at the proper time, and has speculated upon the chances, or be heard, to say that wrong has been done him when by his own inaction he has been one of the parties to the wrong. The court did not err in overruling the motion for a new trial, so far as it was based upon these counter-affidavits.

We have examined the record in this case with more than ordinary care, and the two questions above noticed are the only ones requiring discussion. For aught else that appears, defendant seems in our opinion to have had a most fair and impartial trial,— a trial in which the law applicable to the facts was most ably expounded by the court to the jury,— and one in which the inculpatory facts adduced against defendant are amply sufficient to support the verdict and judgment rendered.

The judgment is affirmed.

*Affirmed.*

[After the delivery of the foregoing opinion the counsel for the appellant filed a motion for a rehearing, which elicited from the court the opinion which follows.— REPORTERS.]

## ON MOTION FOR REHEARING.

WHITE, P. J. In a most earnest brief and argument filed by appellant's counsel in support of his motion for a rehearing, it is mainly insisted that this court overlooked or failed to consider his fourth bill of exceptions reserved upon the trial. Such is not the case, however. The bill was examined and discussed in the consideration of the case, though not noticed in the opinion, for the reason that it was so imperfect and defective in its presentation of the points raised that they could not properly be considered as questions necessary to be determined.

When the State offered the written testimony of the

witnesses Reynolds and Byington, taken on the examining trial of the defendant, the defense objected "because the affidavit (of the district attorney) did not show that said witnesses were, at the time of trial nor at the time of the examining trial, non-residents of the State of Texas, or otherwise beyond the jurisdiction of said court trying said cause; and because there was no evidence of the fact that the testimony offered was the testimony taken upon the examining trial; or that the witnesses had ever signed the same or been sworn thereto, and was only a copy; all of which objections were overruled by the court, to which ruling defendant excepts," etc. The affidavit of the district attorney does expressly state that the witnesses "reside out of the State of Texas, and are residents of the Indian Territory;" and it is in conformity with the provisions of the statute regulating the practice in such cases. Code Crim. Proc. art. 772.

With regard to the other objections to the written testimony of the witnesses, impeaching its identification and authenticity, counsel cites and relies for authority upon *Guy* v. *State*, 9 Texas Ct. App. 162; *Dunlap* v. *State*, 9 Texas Ct. App. 179, and *Davis* v. *State*, 9 Texas Ct. App. 363. The rules as enunciated in each of these cases upon the subject are correct, and the objections here taken would, under these rules, have been sufficient to have excluded the testimony, if these objections were in fact true. But, as presented in the bill of exceptions, what evidence is furnished us that the objections were true? It is true the court signed the bill with the objections as set forth, but the allowance and certificate of the judge was not an admission that the objections were true and verified by the record, but simply amounted to a statement by the court that those objections were the ones presented and relied on. Defendant should have incorporated the evidence in the bill of exceptions, or so much thereof as would have verified the truth of his objections. "Bills of exception must state enough of the evidence or

facts proved in the case to make intelligible the ruling of the court excepted to, in reference to the issues made by the pleadings." Rules Dist. Ct. 59; *White* v. *State*, 9 Texas Ct. App. 41; *Walker* v. *State*, 9 Texas Ct. App. 200; *Wright* v. *State*, 10 Texas Ct. App. 476.

But it may be urged that the statement of facts fails to show affirmatively that the objections are not true, and that the evidence of the witnesses taken on the examining trial as copied in the statement of facts is wanting in all the particulars pointed out by the objections. But it will be noted that all the objections go simply to matters of form in the identification and establishment of the depositions as authentic. The rule with regard to the incorporation of depositions in the statement of facts is that "the commissions, notices and interrogatories in depositions adduced in evidence shall in no case be inserted or copied into a statement of facts, but the evidence thus taken and admitted shall appear in the statement of facts in the same manner as though the witness had been on the stand in giving his evidence, and not otherwise in form or substance." Rules Dist. Court, No. 75. This rule is equally applicable to depositions or the written testimony of witnesses taken on examining trials.

The statement of facts need not show that the prerequisites of the statute with regard to the formal authentication of such evidence have been observed and complied with. Reference, therefore, to the statement of facts cannot aid in determining whether the objections stated in the bill are true or untrue. It devolved upon defendant to show by his bill of exceptions the facts upon which he relied to establish the truth of the objections or the fact that they were well taken. Having failed to do so, his bill of exceptions amounts to nothing, and there was nothing in it upon which we could pass intelligently.

The motion for rehearing is overruled.

*Motion overruled.*